UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


| | | |
|---|---|---|
| JOANN SNYDER, et al., | : | NO. 1:13-cv-00284 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **OPINION AND ORDER** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| et al., | : | |
| Defendants. | : | |


This matter is before the Court on three different motions to dismiss. We consider below Defendant the United States of America's Motion to Dismiss Claims of Plaintiff Jo Ann Snyder (doc. 11), Plaintiff JoAnn Snyder's Memorandum in Opposition (doc. 20) and Defendant's reply (doc. 21); Defendant Special Agent Chris Giordano's Motion to Dismiss (doc. 12), Plaintiff JoAnn Snyder's Memorandum in Opposition (doc. 19) and Defendant's reply (doc. 22); and Defendants the City of Cincinnati and Officer Jason O'Brien's Motion to Dismiss (doc. 16), Plaintiff JoAnn Snyder's Memorandum in Opposition (doc. 18) and Defendants' reply (doc. 23). For the reasons that follow, we GRANT all three pending motions.

## I.   Background[1]

In December 2011, a joint task force of the Federal Bureau of Investigation ("FBI") and the Cincinnati Police Department ("CPD") known as the "Safe Streets Task Force" opened an investigation into the illegal sale of prescription narcotics. As part of that investigation, a confidential informant ("CI") stated that one Stephanie Snyder was selling pills believed to be oxycontin with her mother, whose name might be "JoAnn" (First Amended Complaint, doc. 9 ¶¶ 17–19).  FBI Special Agent Chris Giordano conducted a driver's license search confined to the Greater Cincinnati area for any female in her 50's or 60's named "JoAnn Snyder".   That search identified just one person— Plaintiff (id. ¶ 20).  Giordano showed Plaintiff's Ohio driver's license photograph to the CI, who responded that she could be

---

[1] With one exception, the motions to dismiss pending before the Court are brought pursuant to Fed. R. Civ. P. 12(b)(6).  For purposes of deciding them, therefore, we accept as true the factual allegations made by Plaintiffs JoAnn and Larry Snyder in their First Amended Complaint (doc. 9).  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  We understand Defendant United States' motion to dismiss Plaintiff JoAnn Snyder's claim for negligent hiring, supervision and retention and for failure to train (Claim Four) as being brought pursuant to Fed. R. Civ. P. 12(b)(1), with a motion under Rule 12(b)(6) as in the alternative.  But because we understand the United States' Rule 12(b)(1) motion to be a facial (as opposed to a factual) attack against Plaintiff's claim of subject matter jurisdiction, it remains appropriate for us in this circumstance as well to credit the factual allegations made in the First Amended Complaint.  Moher v. United States, 875 F. Supp. 2d 739, 748 (W.D. Mich. 2012).

the woman seen selling "Oxy" with Stephanie Snyder if the woman had been using illegal drugs since the photograph was taken (id. ¶ 21).

On December 8, 2011, the CI arranged to, and in fact did, purchase sixty (60) pills of oxycontin from Stephanie Snyder and "her mother" with law enforcement (among them Giordano and City of Cincinnati Police Officer Jason O'Brien) watching from an unknown distance while sitting in a vehicle on the street outside the building (id. ¶¶ 22-23). No positive identification was made of the participants (id. ¶¶ 23-24). Approximately one month later, Giordano and another FBI agent met with the woman identified by the CI as "JoAnn". Apparently the agents did not ask for any sort of identification and it is unknown how the woman they met referred to herself, including whether she referred to herself as "JoAnn" or "JoAnn Snyder" (id. ¶¶ 26-29). In January 2012, the FBI terminated its investigation, making no arrests. However, it offered its file to the CPD and, some four months later, specifically on April 16, 2012, O'Brien prepared a criminal complaint and affidavit and secured a warrant from the Hamilton County Court of Common Pleas for Plaintiff's arrest (id. ¶¶ 33-34, 39). The next day, April 17, 2013, Plaintiff JoAnn Snyder was pulled over by members of the West Chester, Ohio police force and her car was surrounded by three police cruisers (id. ¶ 11). She was advised that a warrant had been

3

issued for her arrest on charges of drug trafficking (id. ¶ 12). Thereafter she was arrested and placed in handcuff restraints. She was seated in the back of one of the police cruisers for over an hour and then was taken to the West Chester Police Station where she was held for approximately three (3) more hours (id. ¶¶ 43-44). Plaintiff then was transported to the Hamilton County Justice Center where she was photographed, fingerprinted and forced to give a DNA swab (id. ¶¶ 45-46). She was subjected to a full body strip search, meaning she had to remove all of her clothing, squat naked and cough in front of her jailers (id. ¶ 47). Plaintiff was placed in a holding cell and was not given any food or water until 5:30 a.m. the following morning, which was more than fifteen (15) hours after her arrest (id. ¶ 48). She was arraigned on April 18, 2012 at 9:00 a.m. and released on a $1,000 bond at 11:30 a.m. In all, then, approximately twenty-two (22) hours passed between her arrest and her release (id. ¶¶ 49-50). On April 27, 2012, the Hamilton County grand jury ignored the charges against her (id. ¶ 51), and, on August 15, 2012, an "Entry Expunging All Records Related to Grand Jury No Bill (R.C. 2953.53)" was signed and filed by Hamilton County Court of Common Pleas Judge Charles J. Kubicki, Jr. (id. ¶ 52; doc. 20, Exhibit A[2]). Among the court's

---

[2] Because it is referred to in paragraph 52 of the First Amended Complaint and is central to her claims, this Court can consider

findings within that entry was the following one noting "[t]hat the interests of the applicant in having these records sealed outweigh the need of the government to maintain such records" to which the Assistant Prosecuting Attorney appended this statement, "Ms. Snyder was wrongly accused, State is not and will not object on grounds that the two-year waiting period has not expired" (doc. 20, Exhibit A).

Plaintiff maintains that Defendants now know the real name of the woman referred to by the CI as "JoAnn" who was involved in the December 8, 2011 pill exchange (doc. 9 ¶ 38). She asserts that the woman is not related to Stephanie Snyder in any familial capacity, including being her mother (id. ¶ 37). Moreover, her surname is not "Snyder" and she never has gone by the name of "JoAnn Snyder" (id. ¶¶ 30, 38).

## II. **General Standard of Review under Rule 12(b)(6)**

In Bell Atlantic Corp. v. Twombly, the Supreme Court retired the half-century-old pleading standard of Conley v.

---

Judge Kubicki's entry in resolving these motions to dismiss without converting them to ones for summary judgment. Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir. 1999). Had it not been referenced by Plaintiff, the Court instead would have taken judicial notice of the photocopy of said entry that is attached as Exhibit A to Plaintiff JoAnn Snyder's Memorandum in Opposition to Defendant the United States of America's Motion to Dismiss (doc. 20), again without converting these motions from Rule 12 to Rule 56. Id.

<u>Gibson</u> that a claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Twombly</u>, 550 U.S. 544, 546 (2007) (citing <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957) (emphasis added)).  Federal Rule of Civil Procedure 8(a)(2) "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  <u>Kline v. Mortgage Electronic Security Systems</u>, 659 F. Supp. 2d 940, 945 (S.D. Ohio 2009) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).  A pleading is insufficient if it only offers "a formulaic recitation of the elements of a cause of action" or tenders nothing more than "labels and conclusions." <u>Twombly</u>, 550 U.S. at 555.  A complaint must "state a claim to relief that is plausible on its face" or risk dismissal under Fed. R. Civ. P. 12(b)(6).  <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).  While a court must accept as true all of the factual allegations of the complaint, it is not so bound with regard to legal conclusions, particularly when couched as the former. <u>Iqbal</u>, 556 U.S. at 678-79 (citing <u>Twombly</u>, 550 U.S. at 555 (citing <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986))).

As detailed below, the First Amended Complaint of Plaintiffs JoAnn and Larry Snyder contains a total of twelve claims against various defendants.  Some claims are brought under federal statute, with others sounding in Ohio common law.

6

With regard to the latter, of course, we are bound to follow the law of the state as announced by the Ohio Supreme Court. Savedoff v. Access Group, Inc., 524 F.3d 754, 762 (6th Cir. 2008). If the Ohio Supreme Court has not decided a particular issue, we must do our best to anticipate how it might rule. In re Dow Corning Corp., 419 F.3d 543, 549 (6th Cir. 2005). In this regard, a decision of an intermediate appellate court may be considered persuasive unless we believe it would be at odds with how the highest court might resolve the question. Id.

### III. United States of America's Motion to Dismiss

Prior to the filing of any of the pending motions to dismiss and pursuant to a Rule 41(a)(1)(A)(ii) stipulation, Plaintiffs JoAnn and Larry Snyder voluntarily dismissed with prejudice the following claims against Defendant the United States of America:  Constitutional and/or Civil Rights Violations under Bivens and/or 42 U.S.C. § 1983 (Claim One); Civil Conspiracy to Violate Plaintiff's Constitutional and/or Civil Rights under Bivens and/or 42 U.S.C. § 1983 (Claim Two); and Equal Protection (Claim Three) (see doc. 10 ¶ 2). Thus, the claims asserted by Plaintiff JoAnn Snyder remaining against Defendant United States are:  Negligent Hiring, Failure to Train, Negligent Retention and Supervision (Claim Four); False Arrest and Imprisonment (Claim Five); Assault (Claim Six);

7

Negligence (Claim Nine); Negligent and/or Intentional Infliction of Emotional Distress (Claim Ten); and Punitive Damages (Claim Twelve). All remaining claims by Plaintiff Larry Snyder against Defendant United States were previously dismissed by this Court for lack of jurisdiction (see doc. 26).

### A. Plaintiff's Claim for Negligent Hiring, Supervision and Retention and for Failure to Train Fails Because it is Barred by the Discretionary Function Exception

Defendant moves to dismiss Plaintiff's claim for negligent hiring, supervision and retention and for failure to train initially under Fed. R. Civ. P. 12(b)(1)—that is, for lack of subject matter jurisdiction. Once challenged, it becomes a plaintiff's burden to prove jurisdiction to survive the motion. Moir v. Greater Cleveland Reg'l Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990) (citing Rogers v. Stratton Industries, Inc., 798 F.2d 913, 915 (6th Cir. 1986)). If we find that the Court lacks subject matter jurisdiction, we need not consider Defendant's alternate assertion, namely the sufficiency of this particular claim under Rule 12(b)(6).

It is a fundamental principal that the United States may not be sued without its consent. Montez v. United States, 359 F.3d 392, 395 (6th Cir. 2004) (citing United States v. Orleans, 425 U.S. 807, 814 (1976)). The Federal Tort Claims Act (FTCA), however, does waive the sovereign immunity of the United States in limited circumstances: "The United States shall be liable,

8

respecting the provisions of this title <u>relating to tort claims</u>, <u>in the same manner and to the same extent as a private</u> <u>individual under like circumstances</u>, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674 (emphasis added).  Because the United States can be sued "only to the extent that it has waived its sovereign immunity, [] 'due regard must be given to the exceptions'." <u>Milligan v.</u> <u>United States</u>, 670 F.3d 686, 692 (6th Cir. 2012) (quoting <u>Orleans</u>, 425 U.S. at 814).  The exceptions are set forth in 28 U.S.C. § 2680.  Among them is one known as the "discretionary function" exception, which bars a tort action against the United States if the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." <u>Id</u>. § 2680(a).  A two-part inquiry determines whether this exception applies.  First, the Court must ascertain if the conduct at issue involved an "'element of judgment or choice'." <u>United States v. Gaubert</u>, 499 U.S. 315, 322 (1991) (quoting <u>Berkovitz v. United States</u>, 486 U.S. 531, 536 (1988)).  If a statute, regulation or policy mandates that an employee follow a particular course of action, then the requirement of "judgment or choice" is not satisfied.  <u>Id</u>. (citing <u>Berkovitz</u>, 486 U.S. at 536).  But assuming an element of judgment is found to exist,

9

then a second question presents, namely whether "'that judgment is of the kind that the discretionary function exception was designed to shield'." <u>Id</u>. at 322-23 (quoting <u>Berkovitz</u>, 486 U.S. at 536). Underpinning the exception is Congress' intent to prevent "'judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort'." <u>Berkovitz</u>, 486 U.S. at 536 (quoting <u>United States v. S.A. Empresa de Viacao Aerea Rio Grandense</u> (<u>Varig Airlines</u>), 467 U.S. 797, 814 (1984)). Thus, the exception safeguards "actions and decisions based on considerations of public policy." <u>Id</u>. at 537. We commence our analysis mindful that "we must construe waivers strictly in favor of the sovereign." <u>Library of Congress v. Shaw</u>, 478 U.S. 310, 318 (1986).

Plaintiff avers that "Defendants USA, FBI[3], and Cincinnati negligently hired, failed to train, negligently retained and/or supervised their employees, agents and/or representatives" (doc. 9 at ¶ 76), with no specifics as to what about the hiring, training, retention or supervision was negligent or lacking. Seemingly more detail would be necessary to examine whether the element of "judgment or choice" is present. Defendant represents that "[t]here are no applicable mandatory statutes or

---

[3] The FBI was dismissed with prejudice from all claims and is no longer a party to this litigation (<u>see</u> doc. 10 ¶ 4).

regulations that control or constrict the FBI's exercise of discretion in the hiring, supervision, retention, or training of its agents" (doc. 11 at 13 n.3). Plaintiff counters by attaching "The Attorney General's Guidelines for Domestic FBI Operations (dated 09/29/2008)" and "The Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources (dated 12/13/2006)" to her memorandum in opposition (see doc. 20, Exhibits C and D, respectively), and argues that discovery will reveal whether these guidelines, or any others that might be applicable, were followed.

Plaintiff's stance misses the mark. At issue here is whether those individuals at the FBI responsible for hiring and firing, and the training and supervision that occurs in between, follow express and explicit mandates or whether they exercise judgment. At least two Sixth Circuit panels and two district courts within have recognized that employment decisions made by other agencies of the United States are inherently discretionary in nature and thus fall under the exception. O'Bryan v. Holy See, 556 F.3d 361, 383-34 (6th Cir. 2009); Carlyle v. United States, Dep't of Army, 674 F.3d 554, 557 (6th Cir. 1982) (negligent supervision of army recruits); Zion v. United States, 913 F. Supp. 2d 379, 388-89 (W.D. Ky. 2012) (negligent hiring and supervision of independent contractor by General Services Administration); Whisman v. Regualos, No. 08-12133, 2011 WL

11

4062350, at *6 (E.D. Mich. Sept. 13, 2011) (failure to train security forces at national guard base). Moreover, the First and Fourth Circuit Courts of Appeals have recognized that employment decisions made by the FBI <u>specifically</u> are inherently discretionary in nature and likewise fall under the exception. <u>Suter v. United States</u>, 441 F.3d 306, 313 n.6 (4th Cir. 2006) (claim of negligent hiring and supervision of FBI agent who participated in undercover investigation of large-scale Ponzi and money laundering scheme barred by discretionary function exception); <u>Bolduc v. United States</u>, 402 F.3d 50, 59-62 (1st Cir. 2005) (claim of negligent supervision of FBI agent who failed to give federal prosecutors exculpatory evidence to which defense counsel was entitled barred by discretionary function exception).

<u>Bolduc</u> is especially apposite. The FBI agent who was responsible for placing the "302" reports in the investigation file had been advised by supervisors both orally and in writing that this was an area to which he needed to devote more attention to detail. <u>Id</u>. at 61. The court observed, however, that plaintiff-appellants had not shown that his supervisors "were constrained by any law, regulation, or policy to respond in a particular way upon learning that an agent was not proficient at a particular task." <u>Id</u>. Nor had they referenced "any federal statute, regulation, or policy that dictates a

specific oversight that FBI hierarchs must practice to ensure that agents handle exculpatory evidence." Id. Because the government actors had "latitude" to decide between "alternative courses of action," the conduct at issue was found to be discretionary. Id. And with regard to the second prong of the test, the United States benefits from a presumption that a supervisor's discretionary acts are grounded in policy. Id. at 62 (citing Gaubert, 499 U.S. at 324-25). A plaintiff's failure to rebut this presumption and indicate why the specific supervisory conduct ought not be considered policy-related commands a finding that the exception applies.

Defendant posits that the FBI's decisions regarding its investigation of drug trafficking offenses balance timeliness and speed against accuracy and thoroughness. Similarly, its choice of which agents to hire and fire, and how to train and supervise them while in their employ, encompasses different individual, educational and professional backgrounds of both agents and suspects, issues of safety and security, and ever-present budgetary constraints. Clearly, these determinations are discretionary in nature and Plaintiff has not carried her burden to establish why they do not further policy considerations. Rather, she has side-stepped this threshold issue with irrelevant case law concerning photo line-ups, tainted eyewitness identification and the reliability of the

13

confidential informants. Therefore, because we lack subject matter jurisdiction pursuant to the discretionary function exception to the FTCA, Defendant the United States of America's motion to dismiss Plaintiff JoAnn Snyder's claim for negligent hiring, supervision and retention and for failure to train (Claim Four) is GRANTED under Rule 12(b)(1).

### B. Plaintiff's Claim for False Imprisonment Fails Because It Is Asserted Against a Government Actor; Her Claim for False Arrest Fails Because No Federal Employee Arrested Her and Because She Was Arrested Pursuant to a Valid Warrant

Ohio law recognizes the tort of false arrest and the tort of false imprisonment. The elements of each are essentially indistinguishable in that "each claim requires proof that one was intentionally confined . . . for any appreciable time, against [her] will and without lawful justification." Evans v. Smith, 97 Ohio App. 3d 59, 70, 646 N.E.2d 217, 224 (1994). One key difference does exist, however, with regard to the status of the detaining party. We believe that Judge Zouhary correctly stated Ohio law in observing that "[t]he tort of false imprisonment concerns 'purely a matter between private persons for a private end,' as opposed to a false arrest, which is an unlawful detention 'by reason of an asserted legal authority to enforce the process of law'." Vasquez-Palafox v. United States, No. 3:12 CV 2380, 2013 WL 1500472, at *3 (N.D. Ohio Apr. 10, 2013) (quoting Rogers v. Barbera, 170 Ohio St. 241, 243, 164

14

N.E.2d 162, 164-65 (1960)).  In that case, plaintiff did not bring both a false arrest and false imprisonment claim.  Rather, he brought only the latter, which, because the illegal detention of which he complained was at the hands of Border Patrol agents, the district court converted into one for the former.  <u>Id</u>. at *1, *4.  In this matter, though, Plaintiff appears to have brought <u>both</u> torts against the United States although they are bundled together in her First Amended Complaint as one claim (<u>see</u> doc 9 at 13).  However packaged, any claim for false imprisonment against a government actor fails under <u>Rogers</u>.[4]

Plaintiff's claim for false arrest likewise fails.  It is undisputed that Plaintiff was arrested by members of the <u>West Chester, Ohio</u> police force on the authority of a warrant secured by Officer O'Brien of the <u>Cincinnati</u> Police Department from the <u>Hamilton County</u> Court of Common Pleas (doc. 9 ¶¶ 11, 33, 39).  No federal employee participated in her arrest, detention or imprisonment.  Therefore, the United States is not liable in tort for false arrest.  <u>See</u> <u>Tunne v. Paducah Police Dept.</u>, No.

---

[4] Presumably no party argued this point in the cases cited by Defendant, and thus it was not necessary for our parent circuit to consider the distinction.  <u>See</u> <u>Ross v. Meyers</u>, 883 F.2d 486, 487 (6th Cir. 1989); <u>Walker v. Schaeffer</u>, 854 F.2d 138, 142 (6th Cir. 1988).  Were the exact question presented, though, we are confident it would appreciate the difference.  <u>See</u> <u>Walker v. Kroger's</u>, No. L-93-162, 1994 WL 159764, *2 (Ohio 6 App. Dist. Apr. 29, 1994) ("Claims of false arrest and false imprisonment are oftentimes confused.  A false imprisonment will necessarily follow a false arrest, but a false arrest need not precede a false imprisonment.")

5:08-CV-00188-JHM, 2011 WL 1810521, *5 (W.D. Ky. May 11, 2011); Palmer v. Town of Jonesborough, No. 2:08-cv-345, 2009 WL 1255780, at *6 (E.D. Tenn. May 1, 2009) ("It is axiomatic that a claim against an officer for false arrest must demonstrate, inter alia, that the officer took part in the arrest.").

Tunne is particularly instructive. There plaintiff was arrested following an altercation at a United States Post Office, but the arrest was made by officers of the Paducah, Kentucky Police Department pursuant to a warrant secured by them. Id. at **2-4. A United States Postal Inspector, Defendant Zeman, also investigated the altercation, but local authorities already had sought and acquired the warrant for plaintiff's arrest prior to Zeman finishing his inquiry. Id. at **3-4. Following his acquittal of the state charges filed against him, plaintiff sued several defendants, among them Zeman. The district court granted summary judgment in favor of the government, reasoning that "[n]othing that Defendant Zeman said or did could have influenced the issuance of the arrest warrant. It is not alleged that Zeman personally executed the warrant. Because Defendant Zeman had nothing to do with the Plaintiff's arrest, there is no liability under the FTCA for his actions." Id. at *5.

Plaintiff contends that Special Agent Giordano, unlike Tunne's Zeman, "participated" in her arrest by originally

16

linking her with the alleged illegal prescription drug sales by a woman thought to be Stephanie Snyder's mother, possibly named "JoAnn". We disagree. It is undisputed that the FBI chose to make no arrests in this matter and terminated its investigation in January 2012 (doc. 9 ¶ 33). It is also undisputed that the FBI offered its case file to the Cincinnati Police Department in connection with the joint "Safe Streets Task Force" (id. ¶¶ 17, 33). That local law enforcement chose to seek a warrant for Plaintiff's arrest four months later does not render Special Agent Giordano a "participant" in the arrest. See Richardson v. Nasser, No. 08-12951, 2009 WL 4730446, at *15 (E.D. Mich. Dec. 9, 2009) ("There is nothing in the record to suggest that [defendant] participated in any way in [plaintiff]'s arrest. [Defendant]'s involvement in the investigation was limited to the administration of polygraph examinations. He did not request the prosecutor to charge [plaintiff]. He did not testify at the probable cause hearing. He did not participate in [plaintiff]'s arrest. In sum, there is no basis on which to hold [defendant] liable for false arrest based on his own actions in this case." (emphasis added)). Plaintiff does not allege that the FBI controlled the CPD's investigation once it handed over its file or that it somehow directed CPD officers to arrest her. Nor does she allege that any federal law enforcement knew that a warrant would be sought, or actually had been obtained, for her

17

arrest.    The FBI simply shared its file with the CPD for whatever use the CPD might make of the information contained within it.    There simply can be no presumption of federal law enforcement "participation" in this scenario.[5]

Yet even if this Court were to conclude that Special Agent Giordano's initial incorrect identification of Plaintiff somehow made him a "participant" in her eventual arrest, her claim still would fail.    The parties agree that, under Ohio law, an arrest warrant issued by a court is a complete defense to an action for false arrest unless it is "'utterly void'."  Voyticky v. Village of Timberlake, Ohio, 412 F.3d 669, 677 (6th Cir. 2005) (quoting McFarland v. Shirkey, 106 Ohio App. 517, 524, 151 N.E.2d 797, 802 (1958)); O'Connor v. Kelty, No. 4:10 CV 338, 2013 WL 322199, *10 (N.D. Ohio Jan. 24, 2013) ("[A]n arrest and imprisonment executed upon a facially valid warrant is 'a complete defense to a claim for false arrest and imprisonment'.") (quoting Walker, supra, No. L-93-162, 1994 WL 159764, *2 (Ohio 6 App. Dist. Apr. 29, 1994)).    Defendant maintains, therefore, that because Plaintiff was taken into custody pursuant to a valid warrant issued by a court of competent jurisdiction, her claim for false

---

[5] We agree with Defendant that public policy considerations deserve mention.  Effective law enforcement depends in large measure on federal, state and local agencies freely sharing information.  Were the United States to be held liable in this instance, it might result in a chilling effect vis-à-vis inter-agency cooperation.

arrest fails as a matter of law. Plaintiff counters that the warrant issued by the Hamilton County Court of Common Pleas was not valid because it was based on the flawed identification of her by Giordano. We reject Plaintiff's analysis.

It is true that Plaintiff alleges in her First Amended Complaint that "[t]he basis for the complaint, affidavit and arrest warrant issued in Hamilton County, Ohio against [her] was the <u>false</u> information provided by the FBI to the CPD" (doc. 9 ¶ 40 (emphasis added)). But Plaintiff does not allege that Giordano (or any other member of federal law enforcement) withheld relevant evidence or misrepresented any of the information obtained during the investigation. Nor does she allege that he outright lied or, through some other means, concealed the truth. Instead, the essence of Plaintiff's allegation is that the confidential informant on which Giordano relied when the FBI was conducting its investigation mistakenly identified her as Stephanie Snyder's accomplice and that he, or other federal agents, should have done something more to discover that actually she was not. She urges that the totality of the circumstances suggest that the CI was unreliable, that his or her identification of her was tainted because he or she was shown a singular photograph, and that "nebulous"--which we read in context to mean "insufficient"--efforts were made to corroborate the tip (<u>see</u> doc. 20 at 10-11). Of course, inasmuch

as the federal agents concluded their investigation and made <u>no</u> arrests, there would have been no reason to corroborate the CI's identification.  Still, none of this alleged conduct is the type that would vitiate the "facially valid warrant" defense. <u>Voyticky</u>, 412 F.3d at 677 n.4 (insufficient when evidence exists that "defendant <u>intentionally mislead</u> or <u>intentionally omitted information</u> at a probable cause hearing" (emphasis added)). That the information identifying Plaintiff as Stephanie Snyder's accomplice ultimately proved to be false does not mean that probable cause did not support the original issuance of the warrant.  Further, we note again that <u>federal</u> agents chose to <u>not</u> bring charges against Plaintiff, and there is no suggestion that they encouraged the CPD to do so or even were aware that an arrest warrant would be, or had been, sought for her arrest. For all these reasons, then, Defendant the United States of America's motion to dismiss Plaintiff JoAnn Snyder's claim for false arrest and imprisonment (Claim Five) is GRANTED under Rule 12(b)(6).

**C. Plaintiff's Claim for Assault Fails Because No Federal Officer Touched Her or Attempted to or Threatened to Touch Her**

Under Ohio law, "assault" is a willful threat or attempt to harm or touch another offensively that results in placing the other reasonably in fear of such contact.  <u>Smith v. John Deere Co.</u>, 88 Ohio App. 3d 398, 406, 614 N.E.2d 1148, 1154 (1993).

Given this definition, it is evident that no such claim can be stated against the United States because it is undisputed that no federal law enforcement officer ever touched, or attempted or threatened to touch, Plaintiff.  As previously recited, the FBI terminated its investigation in January 2012, choosing to make <u>no</u> arrests (doc. 9 ¶ 33).  However, it did offer its file to the Cincinnati Police Department (<u>id</u>.), and some four months later, by virtue of an affidavit, complaint and warrant <u>executed by Cincinnati Police Officer O'Brien</u>, Plaintiff <u>was arrested by members of the West Chester, Ohio police force</u> on April 17, 2012 (<u>id</u>. ¶ 39, 43-44).

Plaintiff nevertheless urges that if Special Agent Giordano had not mistakenly associated her name and driver's license photograph with Stephanie Snyder as her accomplice in the illegal sale of prescription oxycontin, she never would have been arrested by local law enforcement.  This alleged "but for" nexus is simply not enough.  And even if this Court were to conclude that federal law enforcement officers somehow effectuated Plaintiff's arrest, no "assault" took place.  Law enforcement officers are privileged to make physical contact in the course of an arrest.  <u>Harris v. United States</u>, 422 F.3d 322, 350 (6th Cir. 2005) (rejecting an assault claim under Ohio law brought pursuant to the Federal Tort Claims Act when Drug Enforcement Agency officers tapped plaintiff on the shoulder,

handcuffed him to a chair and arrested him on a charge of aggravated disorderly conduct, of which he ultimately was acquitted by a jury); Hale v. Vance, 267 F. Supp. 2d 725, 736 (S.D. Ohio 2003).  The contact of which Plaintiff complains, being "handcuffed, forced to give a DNA swab, fingerprinted, had her mug shot taken, and subjected to a full body search" (doc. 20 at 17 (citing doc. 9 ¶¶ 43-46)), are part of a typical arrest protocol.  No claim has been—or could be—made that the contact at issue amounted to excessive force. Therefore, Defendant the United State of America's motion to dismiss Plaintiff JoAnn Snyder's claim for assault (Claim Six) is GRANTED under Rule 12(b)(6).

### D. Plaintiff's Claim for "Negligent Investigation" Fails Because No Such Claim Exists under Ohio Law

Plaintiff's claim for "negligence" is quite sparse.  It states that all Defendants, the United States included, owed an unspecified "duty of care" to her which they violated by their "actions and/or failure to act" (see doc. 9 ¶ 96).  Read in context with the overall framework of the First Amended Complaint, however, we agree with Defendant that the claim she appears to state is one for "negligent investigation".  The fact pattern alleged by Plaintiff depicts Special Agent Giordano and the other federal law enforcement officers with whom he worked as less than thorough in their investigation.  Had they been

22

more careful in trying to identify Stephanie Snyder's accomplice as described by the confidential informant, such as making additional efforts to ascertain her actual first and last names and whether she and Stephanie Snyder truly were related, Plaintiff ultimately would not have been arrested.  Just as we agree with Defendant as to the gravamen of Plaintiff's claim, the Court also agrees that it is not recognized under Ohio law.

The FTCA waives the United States' sovereign immunity and authorizes personal injury suits against it for negligent acts, or failures to act, only "under circumstances where the United States, if a private person, would be liable to the claimant <u>in accordance with the law of the place</u> where the act or omission occurred"  28 U.S.C. § 1346(b)(1) (emphasis added).  <u>Brown v. United States</u>, 583 F.3d 916, 919-20 (6th Cir. 2009) (citing <u>Molzof v. United States</u>, 502 U.S. 301, 305 (1992)).  There appears to be no Ohio Supreme Court ruling on the existence of a tort for negligent investigation, but at least two Ohio intermediate appellate courts have declined to recognize it, <u>Stallworth v. Greater Cleveland Reg'l Transit Auth.</u>, No. 73533, 1998 WL 774987, *4 (Ohio App. 8 Dist. Nov. 5, 1998); <u>Lamson v. The Firestone Tire & Rubber Co.</u>, No. 14692, 1991 WL 35098, *3 (Ohio App. 9 Dist. Mar. 13, 1991), as has an Ohio trial court, <u>Smith v. Interim Services, Inc.</u>, No. 99CVH02-952, 1999 WL 33134348, *1 (Ohio C.P. June 14, 1999).  With no indication that

the Ohio Supreme Court would decide differently, we "decline the invitation to speculate that [it] would be receptive to such a claim." See Rodriguez v. United States, 54 F.3d 41, 47 (1st Cir. 1995). Therefore, Defendant the United State of America's motion to dismiss Plaintiff JoAnn Snyder's claim for negligence (Claim Nine) is GRANTED under Rule 12(b)(6).

### E. Plaintiff's Claims for Negligent Infliction of Emotional Distress as well as Intentional Infliction of Emotional Distress Both Fail as a Matter of Law

#### (1) Negligent Infliction of Emotional Distress

Ohio recognizes the tort of negligent infliction of emotional distress in essentially two instances, namely when an individual was a bystander to a serious accident or was in fear of physical injury to herself. High v. Howard, 64 Ohio St. 3d 82, 85-86, 592 N.E.2d 818, 820-21 (1992), overruled on other grounds, Gallimore v. Children's Hospital Medical Center, 67 Ohio St. 3d 244, 617 N.E.2d 1052 (1993). Defendant maintains that any "fear of physical injury" suffered by a plaintiff must be as a result of her witnessing a serious accident. Typically that circumstance has been the case in the rare occasions when the Ohio Supreme Court has allowed this cause of action to proceed. See, e.g., Schultz v. Barberton Glass Co., 4 Ohio St. 3d 131, 447 N.E.2d 109 (1983); Paugh v. Hanks, 6 Ohio St. 3d 72, 451 N.E.2d 759 (1983). That "bystander" tie, though, apparently is not an absolute, as reflected by the discussion of precedent

24

in _Heiner v. Moretuzzo_, 73 Ohio St. 3d 80, 652 N.E.2d 664 (1995).  There the court found that an individual falsely diagnosed as "HIV [the human immunodeficiency virus] positive" could not recover for emotional distress because she never faced actual physical peril as a result of the alleged negligence of her caregivers.  In other words, because that plaintiff was _not_ "HIV positive," the alleged negligence of the medical personnel involved in the false diagnosis did not produce _an actual threat of physical harm_ to her or any other person.  The text of the opinion in _Heiner_ nicely surveys the prior decisions that have shaped the court's definition of the elements necessary to state a claim under this theory.

> The citation to _Paugh_ in _High_ provides clear justification for the statement that recovery for negligent infliction of emotional distress has been limited to instances where the plaintiff was a bystander to an accident.  Likewise, the citation in _High_ to _Criswell [v. Brentwood Hosp._, 49 Ohio App. 3d 163, 551 N.E.2d 1315] lends valuable insight into the statement that a right to recovery has also been recognized in instances where the plaintiff was placed in fear of physical consequences to his or her own person.

73 Ohio St. 3d at 86, 652 N.E.2d at 669.  The facts in _Heiner_ were somewhat similar to those in _Criswell_ cited above.  Maria Criswell took her young daughter Veronica to a family health center because she complained of stomach pains and a vaginal itch.  The cultures taken at the order of the physician treating her indicated that the child had chlamydia, a sexually-transmitted disease; as required by statute, the staff at the

center notified the authorities that Veronica was a possible victim of child abuse. Veronica was taken to another hospital, where a second set of cultures revealed that she did <u>not</u> have chlamydia. The Court of Appeals for Cuyahoga County upheld the trial court's dismissal of the claim for negligent infliction of emotional distress, noting:

> The claimed misdiagnosis of Veronica put the child in <u>no physical peril</u>. Ohio case law has recognized negligent infliction of emotional distress only where there is cognizance of a real danger, not mere fear of nonexistent peril.

49 Ohio App. 3d at 165, 551 N.E.2d at 1317-18 (emphasis added). While it seems appropriate, then, to infer that fear of a real and existing physical peril need not necessarily be linked to witnessing or experiencing a violent accident, Ohio courts have yet to provide an example of what that situation might be. Thus far, with one exception,[6] Ohio courts only have identified particular events that do <u>not</u> suffice.

---

[6] In <u>Carney v. Knollwood Cemetery Ass'n</u>, 33 Ohio App. 3d 31, 514 N.E.2d 430 (1983), when preparing a grave in a family plot, the remains of a long-deceased relative were accidentally disinterred. Because burial of a newly-deceased relative was imminent, the workers dumped the skeletal remains in a heap just outside the cemetery grounds. Six months later, family members learned what happened after a television news crew received a tip, discovered the remains and notified the police. Suit was filed, and a jury returned an award in favor of the family for negligent infliction of emotional distress. On appeal, the cemetery argued that the trial court should have directed a verdict in its favor. The Cuyahoga County Court of Appeals disagreed, stating "there was until recent years no general availability of recovery for infliction of emotional distress

Upon consideration, we believe that the Ohio Supreme Court would regard the circumstance before us inadequate as well. The "actual physical peril" of which Plaintiff complains is being "handcuffed, arrested, imprisoned, subjected to a cavity search, not provided food, water or her medication for several hours" (doc. 20 at 18 citing doc. 9 ¶¶ 45-46, 48). These events, however, occurred by virtue of actions taken by local rather than federal law officers. Moreover, they are part of the standard procedure followed by law enforcement when an individual is taken into custody. No "peril" is involved—indeed, quite the opposite, as these practices are designed to protect law enforcement from those being arrested and those arrested from others taken into custody. Were we to accept Plaintiff's premise, every individual arrested and then released based on a mistaken identity would state a claim for negligent infliction of emotional distress. We recognize that the Ohio Supreme Court has expressed its commitment to "remain vigilant in [its] efforts to ensure an individual's 'right to emotional tranquility'" (Heiner, 73 Ohio St. 3d at 88, 451 N.E.2d at 670 (quoting Paugh, 6 Ohio St. 3d at 74, 451 N.E.2d at 463)), and we have no doubt that this entire experience was unnerving to

---

without accompanying physical injury. Abuse of dead bodies, however, has received extraordinary treatment in the courts." Id. at 34, 514 N.E.2d at 433. This exception clearly is not applicable to the case at bar.

Plaintiff.  But as Justice Douglas noted in writing the opinion of the court in Heiner, "the facts of this case remind us that not every wrong is deserving of a legal remedy." Id. at 88, 652 N.E.2d at 670.  Therefore, Defendant the United States of America's motion to dismiss Plaintiff JoAnn Snyder's claim for negligent infliction of emotional distress (Claim Ten) is GRANTED under Rule 12(b)(6).

**(2)  Intentional Infliction of Emotional Distress**

The Ohio Supreme Court recognized the tort of intentional infliction of serious emotional distress in Yeager v. Local Union 20, 6 Ohio St. 3d 369, 374-75, 453 N.E.2d 666, 670-71 (1983).  Based on its reading of Yeager, the Sixth Circuit reduced the standard into these four elements: "(1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish." Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995) (citations omitted).  Defendant maintains that none of these elements can be met.

Review of the First Amended Complaint confirms that Plaintiff does not allege that any federal law enforcement officer committed an act with the intent to cause harm

28

specifically to her.  As we continue to recall, the FBI terminated its investigation in January 2012, making no arrests, and offered its file to the Cincinnati Police Department (doc. 9 ¶ 33).  Plaintiff was arrested by members of the West Chester, Ohio police force on April 17, 2012, some four months later, by virtue of an affidavit, complaint and warrant executed by Cincinnati Police Officer O'Brien the day before (id. ¶ 39, 43). Her claim of emotional distress stems from her arrest and confinement, actions taken by local rather than federal law officials.

Contrary to Plaintiff's stance that it is "premature to determine the merits" of her claim (doc. 20 at 19), we heed the observation made by Judge Cohn, sitting by designation and writing for the panel in Miller, who noted that it is "well accepted" that emotional distress claims "may entirely appropriately be dealt with on summary judgment or in a motion to dismiss.  Id. at 377-78 (citing Rogers v. Targot Telemarketing Servs., 70 Ohio App. 3d 689, 691, 695-96, 591 N.E.2d 1332, 1333, 1335-36 (1990) (emphasis added)).  And we believe the simplest approach is to focus on the second element of the Yeager standard.  Without an allegation of conduct that, as a matter of law, is extreme and outrageous, Plaintiff's claim must be dismissed.

The Ohio Supreme Court articulated the essence of "extreme and outrageous" conduct as follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

6 Ohio St. 3d at 374-75, 453 N.E.2d at 671 (quoting Restatement (Second) of Torts § 46(1) cmt. d (1965)). Applying this authority, we conclude that the improper identification of Plaintiff leading to her mistaken arrest is not the set of facts that "'to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"'." 6 Ohio St. 3d at 375, 453 N.E.2d at 671. As we have recounted previously, a confidential informant tipped FBI Special Agent Giordano that a woman named Stephanie Snyder—and her mother whose name could be "JoAnn"—might be selling oxycontin pills. In an effort to locate a photograph to obtain a positive identification from the CI and with no surname other than "Snyder" in the mix, Giordano ran a driver's license search for a woman named "JoAnn Snyder" in an appropriate age band.

30

Plaintiff's photograph was the only match, and the CI indicated that the woman in the picture could be the one he saw _if_ she had been using illegal drugs since it had been taken. For Giordano to proceed on the assumptions that Stephanie Snyder shared the same surname as her mother and that a woman selling illegal oxycontin pills might also be a user of them herself, stops well short of "Outrageous!" conduct. We venture to say one might regard those initial assumptions to be reasonable all things considered. Nonetheless, under any measure, it clearly is not conduct "'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community'." _Id._ Again, nowhere does Plaintiff allege that federal officers were involved in, or even aware of, her subsequent arrest by the CPD. She hopes to proceed on the theory that the inexact efforts by Agent Giordano to identify attempt Stephanie Snyder's accomplice was the "catalyst" that led to her arrest (_see_ doc 20 at 20). As a matter of law, however, the conduct of this federal official plainly cannot be considered either "atrocious" or "utterly intolerable." Therefore, Defendant the United States of America's motion to dismiss Plaintiff JoAnn Snyder's claim for intentional infliction of emotional distress (Claim Ten) is GRANTED under Rule 12(b)(6).

31

F. **Plaintiff's Claim for "Punitive Damages" Fails Because Punitive Damages are Not Available against the United States under the Federal Tort Claims Act**

As recited earlier, the FTCA provides specifically, "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674 (emphasis added). Plaintiff does not dispute this limitation (see doc. 20 at 20). Therefore, Defendant the United State of America's motion to dismiss Plaintiff JoAnn Snyder's claim for punitive damages (Claim Twelve) is GRANTED under Rule 12(b)(6).

## IV. Special Agent Chris Giordano's Motion to Dismiss

Prior to the filing of any of the pending motions to dismiss and pursuant to a Rule 41(a)(1)(A)(ii) stipulation, Plaintiffs JoAnn and Larry Snyder voluntarily dismissed with prejudice the following claims against Defendant Special Agent Chris Giordano: False Arrest and Imprisonment (Claim Five); Assault (Claim Six); Negligence (Claim Nine); Negligent and/or Intentional Infliction of Emotional Distress (Claim Ten); and Loss of Consortium (Claim Eleven) (see doc. 10 ¶ 3). Thus, the claims asserted by Plaintiff JoAnn Snyder remaining against Defendant Giordano are: Constitutional and/or Civil Rights

32

Violations under Bivens and/or 42 U.S.C. § 1983 (Claim One); Civil Conspiracy to Violate Plaintiff's Constitutional and/or Civil Rights under Bivens and/or 42 U.S.C. 1983 (Claim Two); Equal Protection (Claim Three); and Punitive Damages (Claim Twelve).   There are no claims by Plaintiff Larry Snyder remaining against Defendant Giordano.

### A. Plaintiff's Claims Fail Because Special Agent Giordano is Entitled to Qualified Immunity

We begin by observing that Plaintiff's first, second and third claims are couched in the alternative.   She pleads violations of her constitutional rights under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971) or of her civil rights under 42 U.S.C. § 1983.   Defendant Giordano, of course, is an employee of the FBI and thus a federal actor. Therefore, he cannot be sued under Section 1983.   See, e.g., Shepherd v. Sheldon, No. 1:11 CV 127, 2011 WL 2971965, at *7 (N.D. Ohio July 21, 2011) ("[T]his statute does not apply to defendants as they are federal actors . . . .").   We proceed, therefore, on the presumption that Plaintiff asserts Bivens claims against Defendant Giordano.   As Defendant correctly observes, however, federal courts permissibly consult case law addressing Section 1983 claims when weighing Bivens claims against federal actors.   See Harlow v. Fitzgerald, 457 U.S. 800,

818 n.30 (1982) (citing Butz v. Economou, 438 U.S. 478, 504 (1978)).

Qualified immunity generally protects government actors who perform discretionary functions and shields them from liability for civil damages "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987) (citing Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law")); Mitchell v. Forsyth, 472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions" they took)); Harlow, supra, 457 U.S. at 818 (immunity attaches so long as the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.")). The doctrine of qualified immunity thus would protect Defendant Giordano "'from liability for civil damages insofar as [his] conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known'." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow, supra, 457 U.S. at 818). Prior to the Supreme Court's decision in Pearson, a two-tiered analysis was required, beginning with this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the

34

officer's conduct violated a constitutional right?" <u>Saucier v.
Katz</u>, 533 U.S. 194, 201 (2001) (citing <u>Siegert v. Gilley</u>, 500
U.S. 226, 232 (1991)).  If the answer to that initial inquiry is
negative, immunity attaches.  If not, "[and] a violation could
be made out on a favorable view of the parties' submissions, the
next, sequential step is to ask whether the right was clearly
established." <u>Id.</u> <u>Pearson</u> ruled that following <u>Saucier</u>'s "two-
step protocol" is not mandatory, but remains permissible.  555
U.S. at 821.  A lower court, in its discretion, now may consider
the second question first if it believes such a path "will best
facilitate the fair and efficient disposition" of the case
before it.  We still are at liberty, however, to follow the
<u>Saucier</u>-prescribed sequence if we find it "worthwhile." <u>Id.</u>

Qualified immunity is "'an <u>immunity from suit</u> rather than a
mere defense to liability'." <u>Id.</u> (quoting <u>Mitchell</u>, <u>supra</u>, 472
U.S. at 526 (emphasis original)).  The United States Supreme
Court has been resolute and consistent in its message that "the
'driving force' behind creation of the qualified immunity
doctrine was a desire to ensure that '"insubstantial claims"
against government officials be resolved prior to discovery'."
<u>Id</u>. at 231-32 (quoting <u>Anderson</u>, 483 U.S. at 640 n.2).  Immunity
questions, therefore, should be resolved "at the earliest
possible stage in litigation." <u>Hunter v. Bryant</u>, 502 U.S. 224,
227 (1991) (<u>per curiam</u>).

Defendant Giordano asserts that the doctrine qualified immunity bars Plaintiff's first, second and third claims because: (1) the conduct of which she complains is not intentional but amounts to, at most, negligence; (2) he was not personally involved in her arrest; and (3) she was arrested pursuant to a valid arrest warrant. We agree all around.

(1) **False Arrest**

To succeed on a <u>Bivens</u> claim, a plaintiff must prove that "the individual defendants acted with the <u>intent</u> to deprive them of their constitutional rights; negligence alone will not [suffice]." <u>Milligan v. United States</u>, <u>supra</u>, Nos. 3:07-1053, 3:08-0380, 2009 WL 2905782, at *3 (M.D. Tenn. Sept. 4, 2009) (emphasis added), <u>aff'd</u>, 670 F.3d 686 (6th Cir. 2012); <u>see</u> <u>Connor v. Helo</u>, No. 85-5215, 1987 WL 44930, at *3 (6th Cir. Oct. 2, 1987) ("Since this was a <u>Bivens</u> action, [plaintiff] had the burden of proving that the individual defendant acted with the <u>intent</u> to deprive him of rights secured by the constitution. <u>Mere negligence is insufficient</u> to ground a <u>Bivens</u> action." (emphasis added)). As discussed in previous portions of this Opinion and Order, particularly Sections III.D. and III.E.(2), such intent simply cannot be attributed to Defendant Giordano. While he may have relied on information that later proved erroneous, such as the first name of Stephanie Snyder's accomplice ("JoAnn") and the existence of a mother-daughter

36

relationship between them allowing the inference that they could share the same surname ("Snyder"), Plaintiff does not allege that he lied or made any intentional misrepresentations during his investigation. Thus, he remains entitled to the presumption of immunity.

Hale v. Kart is instructive. There an officer was called to a private residence to resolve a domestic dispute. 396 F.3d 721, 723 (6th Cir. 2005). The female in the relationship was intoxicated and informed the officer, who in turn involved a deputy county sheriff, that the father of two of her children, Plaintiff Hale, sold prescription drugs out of his home. Id. The deputy, Defendant Kart, obtained a search warrant based on his interview with the female. His affidavit did not include the fact that the female was angry at Plaintiff Hale or that she was under the influence of alcohol. Although some prescription drugs and a significant amount of currency were found in the search, Plaintiff Hale was not arrested. He later sued Defendant Kart under Section 1983. Id. at 724. The Sixth Circuit reversed the district court's denial of qualified immunity, and reaffirmed the standard by which to evaluate warrants obtained on the basis of erroneous information. Id. at 726 ("[P]laintiffs must make a strong preliminary showing 'that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to

37

the finding of probable cause'." (quoting <u>Mays v. City of Dayton</u>, 134 F.3d 809 , 816 (6th Cir. 1998) (emphasis original)).

So, too, is <u>Milligan</u>, <u>supra</u>. The U.S. Marshals Service, pursuant to a warrant for "Paula Milligan" a.k.a. "Paula Rebecca Staps," arrested Plaintiff Paula Ann Milligan. It was undisputed that the law enforcement officials arrested the wrong person. 2009 WL 2905782, at *1. The district court denied the motion by plaintiff and her husband to reinstate their <u>Bivens</u> claims. To resurrect these claims would be futile, as they would be subject to dismissal on the grounds of qualified immunity. To this end the trial judge concluded, "Mrs. Milligan's arrest resulted from certain law enforcement errors that constituted, at most, negligence." <u>Id</u>. at *3. The same circumstance attends Plaintiff Snyder's arrest. That she was identified as Stephanie Snyder's accomplice was a mistake, nothing more. As we have concluded already, the driver's license search was reasonable under the circumstances. In like manner, Special Agent Giordano's reliance on the judgment of the confidential informant about whether the woman in that photograph could be the accomplice was appropriate.[7]    A

---

[7] We are not persuaded by Plaintiff's "improper and unduly suggestive photo line-up" theory (<u>see</u> doc. 19 at 7-9). As defense counsel notes, the facts upon which we proceed make plain that Special Agent Giordano used this photograph to get a sense of whether he had found the proper target for his investigation. One might infer that he discovered he did not,

presumption that a _seller_ of illegal prescription narcotics might also be a _user_ of illegal prescription narcotics is rational. Plaintiff alleges that Defendant Giordano eventually met with the accomplice and did not ask her to produce any identification (_see_ doc. 9 ¶ 27). Again, assuming its truthfulness, this allegation bespeaks an oversight, a guileless negligent act.

We segue next into a brief discussion of the second reason why Defendant Giordano is entitled to immunity, namely his lack of personal involvement with her arrest. We recall again, as more fully detailed in Section III.B. of this Opinion and Order, that Special Agent Giordano concluded his investigation on behalf of the FBI in January 2012 and elected to make _no_ arrests. Four months later, Plaintiff was arrested by the West Chester police force on the authority of a warrant secured by a _Cincinnati_ police officer from a _Hamilton County_ court. Plaintiff does not allege that Defendant Giordano controlled or directed local law enforcement once he turned the investigative file over to them, or that he knew that a warrant would be

---

as he ended his, and the FBI's, involvement. Regardless, no inference is necessary to observe that he purposefully did _not_ seek a warrant for her arrest. Moreover, we do not believe that Defendant Giordano was under an obligation to excise mention of Plaintiff JoAnn Snyder from the investigation file that was offered to the Cincinnati Police Department for its use. Neither Plaintiff nor any other citizen has a constitutional right to be free from a law enforcement investigation.

sought, or had been obtained, for her arrest. Without a doubt, these circumstances merit a finding of immunity. <u>Jacob v. Township of West Bloomfield</u>, 192 Fed. App'x, 330, 336 (6th Cir. 2006) ("To succeed [], a plaintiff must show personal involvement by the defendant in the constitutional violation.").

In <u>Lozada v. Wilmington Dep't of Police</u>, local law enforcement officers from Wilmington, Delaware were assigned to work in tandem with federal agents of the Drug Enforcement Administration. Using his driver's license photograph, they mistakenly identified Plaintiff Heriberto Lozada as the driver of a vehicle involved in the sale of heroin. Civ. A. No. 07-663, 2008 WL 1994870, at *1 (E.D. Pa. May 5, 2008). Federal law enforcement sought a warrant that was executed by officers in a different municipality. Plaintiff was jailed for four days following his arrest. At a pretrial hearing, one of the Wilmington officers realized that plaintiff was not the individual he saw driving the vehicle, who eventually was identified as Heriberto Lozada-Espinoza. Charges against plaintiff were dropped, and he filed a Section 1983 suit. The constitutional false arrest claim against the Wilmington officers was dismissed, however, because the trial court opined, "where an officer merely provides information and neither participates in the arrest, nor directs others to effectuate the arrest, he cannot be liable for false arrest." <u>Id</u>. at *4

(quoting Miller v. County of Allegheny, Civ. A. No. 05-733, 2006 WL 3332809, at *8 (W.D. Pa. Nov. 16, 2006)).  The actions of Defendant Giordano mimic this situation; thus, we conclude that he bears no legal responsibility for Plaintiff Snyder's arrest and is immune from suit.

Finally, we conclude that Defendant Giordano also is entitled to immunity because Plaintiff was arrested pursuant to a facially valid warrant supported by adequate probable cause. "'An arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment,' unless the defendant intentionally misled the court or omitted 'material information' in seeking the warrant." Nerswick v. CSX Transp., Inc., 441 Fed. App'x 320, 322 (6th Cir. 2011) (quoting Voyticky, supra, 412 F.3d at 677, 677 n.4).  The Court has discussed before in Section III.B. of this Opinion and Order our belief that probable cause supported Plaintiff's arrest.  The conduct of which Defendant Giordano is accused does not undercut the "facially valid warrant" defense. As we have noted in a previous ruling, the law accepts the risk that in some cases officers may arrest the innocent.  So long as the arrest is based on probable cause, however, it passes muster. See Young v. Owens, No. 1:11-CV-00853, 2013 WL 1915098, at *6 (S.D. Ohio May 8, 2013).  For all these reasons, then, because we conclude that no constitutional

41

rights have been compromised and thus his actions are immune from suit, Defendant Special Agent Chris Giordano's motion to dismiss Plaintiff's claim for false arrest (Claim One) is GRANTED under Rule 12(b)(6).

(2) **Civil Conspiracy**

To avoid a Rule 12 dismissal of this type of claim, Plaintiff must allege facts that establish these three premises: a "single plan" existed, the participants "shared a conspiratorial objective to deprive [her] of [her] constitutional rights" and an "overt act" was committed. <u>Faith Baptist Church v. Waterford Twp.</u>, No. 10-1406, 2013 WL 1489387, at *6 (6th Cir. Apr. 11, 2013) (civil conspiracy under Section 1983) (quoting <u>Revis v. Meldrum</u>, 489 F.3d 279, 290 (6th Cir. 2007). Moreover, civil conspiracy claims must be pled "'with some degree of specificity'" and "'vague and conclusory allegations unsupported by material facts'" will not suffice. <u>Spadafore v. Gardner</u>, 330 F.3d 849, 854 (6th Cir. 2003) (civil conspiracy under Section 1983) (quoting <u>Gutierrez v. Lynch</u>, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff's allegations fall substantially short. She avers in the First Amended Complaint that all Defendants "conspir[ed] to violate her constitutional [] rights" without

42

reference to which ones (see doc. 9 ¶ 65)[8], that they "engaged, participated, arranged, contributed, knew, and/or should have known that J[oAnn] Snyder was not the subject person involved in any illegal activity at issue" (id. ¶ 66) and that Defendant Giordano "provided false and defamatory information" to Defendant Cincinnati Police Department and Officer O'Brien "knowing and intending" for them to act upon it (id. ¶ 67). These allegations, though, like the ones in Faith Baptist Church, are threadbare. The "single" plan to which all were privy remains unidentified, and while Plaintiff maintains that Giordano "intended" for the City Defendants to "act" on the information, there is no allegation that he knew or intended that a warrant for her arrest would be, or had been, sought. Nor is there a suggestion that he contemporaneously learned that a warrant had issued for her arrest. Further, a four-month gap between the close of his investigation and Officer O'Brien's choice to seek a warrant weakens the case for concerted or "conspiratorial" activity. Therefore, finding again the lack of a constitutional violation in providing erroneous information to a local law enforcement agency, Defendant Special Agent Chris Giordano is entitled to qualified immunity and his motion to

---

[8] Not until review of her Memorandum in Opposition do we learn that she believes she was deprived of "her Fourth Amendment right and right to due process" (see doc. 19 at 15-16).

dismiss Plaintiff's claim for civil conspiracy (Claim Two) is GRANTED under Rule 12(b)(6).

(3) **Equal Protection**

A facially-valid equal protection claim requires a plaintiff to plead adequately that the government treated her "'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis'." Center for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 379 (6th Cir. 2011) (quoting Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich., 470 F.3d 286, 299 (6th Cir. 2006)). The "threshold element" of an equal protection claim, therefore, is disparate treatment. Id. (citing Scarbrough v. Morgan Cnty. Bd. of Educ., 470 F.3d 250, 260 (6th Cir. 2006)).

Plaintiff does not allege anywhere within her First Amended Complaint that she is a member of any protected class or that any Defendant, including Special Agent Giordano, took action against her based on her membership in any such class. Rather, the action of which Plaintiff complains is Defendant Giordano's failure to more precisely identify the woman who, along with Stephanie Snyder, participated in the December 8, 2011 illegal sale of oxycontin pills. It is disingenuous for Plaintiff to suggest in her memorandum in opposition that "individuals in their '50's-60's' were targeted for arrest, despite the police's

44

lack of verifiable information" (doc. 19 at 16). Rather, the clear inference from the allegations appearing in her First Amended Complaint is that the age band chosen by Defendant Giordano was defined by the confidential informant's tip "that a woman named Stephanie Snyder and her mother were selling pills believed to be 'Oxy'" (doc. 9 ¶ 19 (emphasis added)). Given such a description, to run a database search of a woman in her fifties or sixties does not bespeak disparate treatment based on age. In this circumstance, that Plaintiff happens to be over forty years of age is purely coincidental and thus unsupportive to any claim of an equal protection violation. See Tunne, supra, No. 5:08CV-188-R, 2010 WL 323535, *2 (W.D. Ky. Jan. 21, 2010) (claim brought against state law enforcement officer fails when a plaintiff does not allege that "the failure to investigate was on the basis of race or other characteristic that would implicate any equal protection violation" (emphasis added)). As before, because no constitutional right in this regard has been violated, Defendant Special Agent Chris Giordano is entitled to qualified immunity and thus his motion to dismiss Plaintiff JoAnn Snyder's claim for equal protection (Claim Three) is GRANTED under Rule 12(b)(6).

B. **Plaintiff's Claim for "Punitive Damages" Fails Because a Federal Employee Has Absolute Immunity from any State Law Torts Committed in the Scope of His Employment and Because Her <u>Bivens</u> Claims Do Not Survive Defendant's Rule 12(b)(6) Challenge**

Ohio law does not recognize a separate cause of action for "punitive damages." <u>Pierson v. Rion</u>, No. CA23498, 2010 WL 1636049, *9 (Ohio App. 2 Dist. April 23, 2010) ("[I]t is well settled that a civil cause of action sounding solely in punitive damages cannot be maintained.") (citing <u>Richard v. Hunter</u>, 151 Ohio St. 185, 189, 85 N.E.2d 109, 111 (1949)). Rather, punitive damages are a type of damages to which a plaintiff may be entitled in certain circumstances and, in Ohio, they are governed by statute. In tort actions, a prevailing plaintiff must first be awarded compensatory damages by the trier of fact. O.R.C. § 2315.21(C). Then, she must establish, by clear and convincing evidence, that the defendant acted, or failed to act, with malice or "aggravated or egregious fraud." <u>Id</u>. §§ 2315.21(C), 2315.21(D)(4).

Defendant urges that, even if Ohio recognized a separate tort action for "punitive damages," it would fail as a matter of law with respect him. The Court agrees. The Rule 41(a)(1)(A)(ii) stipulation to which we referred earlier states expressly that "Defendant Special Agent Chris Giordano was acting within the scope of his employment as an agent of the Federal Bureau of Investigation with respect to the

46

investigation at issue in this lawsuit" (doc. 10 ¶ 1).  Thus, under the FTCA, any tort claim against Giordano becomes a claim against the United States (see 28 U.S.C. §§ 1346(b)(1), 2671-2680),[9] which, as previously discussed, is not liable in punitive damages (id. § 2674 and Section III.F. supra).

Plaintiff explains that she alleged "punitive damages" specifically as a claim "in order to clarify her prayer for relief against all Defendants" (doc. 19 at 16).  Such a response is puzzling inasmuch as she prays for punitive damages in the "Relief Requested" portion of her First Amended Complaint (doc. 9 at 18).  Particularly with regard to Defendant Giordano, however, Plaintiff urges that she would be entitled to request punitive damages in the event she prevails on her Bivens claims against him.  See, e.g., Hui v. Castaneda, 559 U.S. 799, 805 (2010) (citing Carlson v. Green, 446 U.S. 14, 21-22 (1980)).  The issue of damages is now moot, however, inasmuch as we have dismissed those claims.  Therefore, Defendant Special Agent Chris Giordano's motion to dismiss Plaintiff JoAnn Snyder's

---

[9] Because Plaintiff brought all the state tort claims asserted initially against Special Agent Giordano against the United States as well, there apparently was no need to substitute the latter for the former.  Rather, the parties' Rule 41(a)(1)(A)(ii) stipulation instead dismissed with prejudice the United States from Plaintiff's constitutional claims (doc. 10 ¶ 2) and in turn dismissed with prejudice Special Agent Giordano from Plaintiff's state tort claims (id. ¶ 3).

claim for punitive damages (Claim Twelve) is GRANTED under Rule 12(b)(6).

### V.  City of Cincinnati and Officer Jason O'Brien's Motion to Dismiss

Plaintiffs JoAnn and Larry Snyder did not enter into a Rule 41(a)(1)(A)(ii) stipulation with Defendants the City of Cincinnati and Officer Jason O'Brien prior to the filing of these pending motions to dismiss.  Thus, the claims asserted by Plaintiff JoAnn Snyder against Defendants City of Cincinnati and O'Brien are:  Constitutional and/or Civil Rights Violations under Bivens and/or 42 U.S.C. § 1983 (Claim One); Civil Conspiracy to Violate Plaintiff's Constitutional and/or Civil Rights under Bivens and/or 42 U.S.C. § 1983 (Claim Two); and Equal Protection (Claim Three); False Arrest and Imprisonment (Claim Five); Assault (Claim Six); Malicious Prosecution (Claim Seven); Abuse of Process (Claim Eight); and Negligence (Claim Nine). Plaintiff JoAnn Snyder also brings a claim for Negligent Hiring, Failure to Train, Negligent Retention and Supervision (Claim Four) against Defendant City of Cincinnati.  A single claim of Loss of Consortium (Claim Ten) is asserted by Plaintiff Larry Snyder against Defendant City of Cincinnati and O'Brien. The claims asserted by both Plaintiffs JoAnn and Larry Snyder against Defendant City of Cincinnati and O'Brien are:  Negligent

48

and/or Intentional Infliction of Emotional Distress (Claim Ten) and Punitive Damages (Claim Twelve).

Plaintiffs' factual allegations involving Officer O'Brien and, in turn, the City of Cincinnati are fewer. For purposes of deciding their motions to dismiss, we accept as true the involvement of the Cincinnati Police Department in the "Safe Streets Task Force" with the FBI (doc. 9 ¶ 17) and Officer O'Brien witnessing from a distance the December 8, 2011 sale of oxycontin by Stephanie Snyder and her accomplice, whose identity was not confirmed (id. ¶¶ 23, 24). We also accept as true that Officer O'Brien prepared a criminal complaint and affidavit and secured a warrant from the Hamilton County Court of Common Pleas for Plaintiff JoAnn Snyder's arrest approximately four months later, specifically on April 16, 2012 (id. ¶ 40). The information proffered to support his complaint and affidavit was that contained within the investigative notes of Special Agent Giordano (id. ¶ 41) and neither O'Brien, nor any other member of the CPD, made any further inquiry into the true identity of the accomplice (id. ¶ 42). The details concerning Plaintiff JoAnn Snyder's subsequent arrest and detainment, as well as the Hamilton County Grand Jury's return of a "no-bill" and Judge Kubicki's entry of expungement, of course, are common to both the federal and municipal actors.

A. **The Civil Rights Claims Asserted by Plaintiff JoAnn Snyder against Defendants City of Cincinnati and O'Brien Fail as a Matter of Law**

Because they are state (actually, municipal) rather than federal actors, defendants the City of Cincinnati and Officer O'Brien are appropriately sued under 42 U.S.C. § 1983. See generally Scheuer v. Rhodes, 416 U.S. 232 (1974). We note that Officer O'Brien is sued both in his official and individual capacities.    In Hafer v. Melo, the Supreme Court reviewed and clarified the distinction between official- and personal (or individual)-capacity suits brought under Section 1983. Official-capacity suits "'"generally represent only another way of pleading an action against an entity of which an officer is an agent"'." 502 U.S. 21, 25 (quoting Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978))).  A suit against a state official in his official capacity should be regarded as a suit against the State itself. Graham, 473 U.S. at 166.  The governmental entity rather than the named official is the "real party in interest" in an official-capacity suit, and thus "'the entity's "policy or custom" must have played a part in the violation of federal law'." Hafer, 502 U.S. at 25 (quoting Graham, 473 U.S. at 166 (quoting Monell, 436 U.S. at 694)). Accordingly, the "only immunities available to the defendant in an official-capacity action are those that the governmental

50

entity possesses." Hafer, 502 U.S. at 25 (citing Graham, 473
U.S. at 167). Personal-capacity suits, in contrast, "seek to
impose individual liability upon a government officer for
actions taken under color of state law." Id. at 25. Personal
liability is established when "'the official, acting under color
of state law, caused the deprivation of a federal right'." Id.
(quoting Graham, 473 U.S. at 166). Tie to a "policy or custom"
need not be proved by a plaintiff, and an official sued in his
personal capacity may "assert personal immunity defenses such as
objectively reasonable reliance on existing law." Hafer, 502
U.S. at 25 (citing Graham, 473 U.S. at 166-67)). As noted in
Section IV.A. of this Opinion and Order, the case law that
comprises Bivens and Section 1983 jurisprudence essentially is
interchangeable, including decisions attending the issue of
whether a government actor is immune from suit. Harlow, supra,
457 U.S. at 818 n.30 ("We have found previously . . . that it
would be 'untenable to draw a distinction for purposes of
immunity law between suits brought against state officials under
§ 1983 and suits brought directly under the Constitution against
federal officials'." (quoting Butz, supra, 438 U.S. at 504)).

Defendant O'Brien asserts that the doctrine of qualified
immunity bars Plaintiffs' first, second and third claims as to
him in his individual capacity. Just as we concluded that
Defendant Special Agent Giordano was entitled to immunity, we

agree that Defendant O'Brien is as well. The essence of the facts alleged with regard to O'Brien is that he should not have relied exclusively on Giordano's investigation notes when seeking a warrant for Plaintiff JoAnn Snyder's arrest, but rather should have done something more to identify Stephanie Snyder's accomplice. The Court already has recited in detail why we believe that the actions attributed to Giordano were reasonable under the circumstances in Sections III.D., III.E.(2) and IV.A.(1) of this Opinion and Order. Concomitantly, we find O'Brien's reliance on the work product of Giordano to be reasonable.[10] That he did not "double-check" the accuracy of the information within the FBI's file does not amount to a civil rights violation. At most, it might be tantamount to negligence, but "negligence does not equate to a constitutional violation." Fettes v. Hendershot, 375 Fed. App'x 528, 532 (6th Cir. 2010). Fettes also involved a Section 1983 claim for unlawful arrest under the Fourth Amendment. Robert Fettes, Sr. owned a holding company that operated a number of pizza parlors. It filed for bankruptcy protection in 1998, when its assets were

---

[10] In her memorandum in opposition, Plaintiff posit that it would be a "reasonable inference" for the Court to presume that because O'Brien was a member of the joint task force, he played some role in identifying her as Stephanie Snyder's accomplice (see doc. 18 at 7-9). On the contrary, given the specific allegations she made in the First Amended Complaint about the identification and interview process in which Giordano engaged (see doc. 9 ¶¶ 17-21, 26-29), we think such an inference quite unreasonable.

bought by son, Robert Fettes, Jr.   Junior formed a new company
that continued to operate the same pizza parlors.   _Id_. at 529.
In 2004, however, the new company came under the scrutiny of an
agent of the Ohio Bureau of Workers' Compensation for failure to
pay premiums.   The agent initiated a criminal complaint, and a
municipal court deputy clerk signed and issued the private
warrant.   Senior was pulled over for a traffic stop by a local
police officer, who made a routine call to his dispatch to learn
if there were any outstanding warrants on the driver.   The
dispatch responded affirmatively, and Senior was arrested and
taken into custody, at which time he protested that he was not
the correct "Robert Fettes".   Within a couple of hours, the
matter was straightened out using social security numbers, and
Senior was released.   _Id_. at 530.   Senior sued a number of
municipal actors, among them the dispatch.   The Sixth Circuit
found no constitutional violation:

> Under the Fourth Amendment, the validity of an arrest
> warrant depends, _inter alia_, upon its issuance being
> supported by probable cause.  _Baker v. McCollan_, 443 U.S.
> 137, 142-43 [] (1979).  Arrest warrants in the hands of a
> police officer, unless facially invalid, are presumed
> valid. The Supreme Court has held that if, in executing a
> presumptively valid arrest warrant, the police reasonably
> mistake a second person as being the individual named in
> the warrant and arrest him, the arrest of the second person
> does not offend the Constitution.  _Hill v. California_, 401
> U.S. 797, 802 [] (1971).
>
> In _Masters v. Crouch_, 872 F.2d 1248 (6th Cir. 1989),
> this court held that 'police and correction employees may
> rely on facially valid arrest warrants even in the face of

> vehement claims of innocence by reason of mistaken identity
> or otherwise.' Id. at 1253 (citing Baker, 443 U.S. at 145
> []).

Id. at 532.  Senior argued to no avail that the dispatch should
have done a better job at verifying that the warrant was not for
him but rather for Junior.[11]   Id. at 532-33.   For the same
reasons, we reject Plaintiff's claim that O'Brien should have
investigated further before seeking a warrant for "JoAnn
Snyder".   Thus, because no constitutional violation has been
stated, Officer O'Brien is entitled to immunity.[12]

In the absence of any unconstitutional conduct by Officer
O'Brien, the City of Cincinnati itself cannot be liable under
Section 1983.  Watkins v. City of Battle Creek, 273 F.3d 682,
687 (6th Cir. 2001) (citing City of Los Angeles v. Heller, 475

---

[11] Our parent circuit took note as well that the dispatch did not
arrest Senior, much as Special Agent Giordano did not arrest
Plaintiff JoAnn Snyder.  Fettes, supra, 375 Fed. App'x at 532.
Fettes was an appeal of a district court's denial of qualified
immunity on summary judgment.  Plaintiffs' memoranda in response
to all three motions to dismiss are replete with references to
the fact that discovery is needed before the Court can make a
proper assessment of Defendants' immunity defense.  To this end
we quote Judge Marbley, "Despite the Supreme Court's instruction
to raise the qualified immunity issue 'at the earliest possible
stage in litigation,' Hunter, [supra,] 502 U.S. at 227 [], many
parties wait until the summary judgment stage to raise the
issue. It is not clear to us why a government official would
submit himself to depositions and other discovery methods,
rather than assert his entitlement to qualified immunity
immediately after being served with a § 1983 complaint." Id.
(emphasis added).

[12] Nor have constitutional violations been stated with regard to
civil conspiracy and equal protection, and thus Officer O'Brien,
just like Special Agent Giordano, is entitled to immunity on
these claims, too.  See Sections IV.A.(2) and (3), supra.

U.S. 796, 799 (1986) (per curiam)).  The First Amended Complaint states, without elaboration, that culpability arises out of "de facto policies, procedures and/or customs which include, but are not limited to, to a failure to properly train, supervise, discipline, transfer, monitor, counsel or otherwise control [its] employees and agents and/or a ratification or acquiescence of [its] employees and agents' unlawful actions" (doc. 9 ¶ 60). With no factual context, this "allegation" amounts to no more a legal conclusion, one we are not bound to accept in deciding this Rule 12 motion.  Iqbal, supra, 556 U.S. at 678-79 (citations omitted).  Moreover, a single instance of alleged unconstitutional conduct will not suffice to state a Section 1983 claim against a municipality.  In City of Oklahoma City v. Tuttle, the widow of a man shot by police sued, alleging that his death was the result of inadequate training.  471 U.S. 808 (1985).  Her argument was rejected in light of the precedent established by Monell, supra.  Justice Rehnquist stated:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

55

471 U.S. at 823-24 (footnotes omitted).  Plaintiff JoAnn Snyder
alleges a single instance of conduct, her mistaken arrest.  Even
if we had found that it was not supported by probable cause,
under Monell as applied by Tuttle, the City still would not be
liable.    Therefore, the motion to dismiss Plaintiff JoAnn
Snyder's claims for civil rights violations under 42 U.S.C. §
1983 (Claim One), for civil conspiracy to violate same (Claim
Two) and for equal protection (Claim Three) against the City of
Cincinnati and Officer O'Brien (in his official and individual
capacities) is GRANTED under Rule 12(b)(6).

B. **The State Tort Claims Asserted by Plaintiff JoAnn Snyder,
   both Individually and Jointly with her Husband, and by
   Plaintiff Larry Snyder, both Individually and Jointly with
   his Wife, against Defendants City of Cincinnati and O'Brien
   Fail as a Matter of Law**

Chapter 2744 of the Ohio Revised Code governs whether a
political subdivision, including its agencies and employees, has
immunity from liability.  As in the federal arena, when an
employee is sued in his official capacity, it is considered a
suit against the political subdivision itself.  Whether immunity
attaches depends on a three-tiered analysis set forth in O.R.C.
§ 2744.02(B).  See Elston v. Howland Local Schools, 113 Ohio St.
3d 314, 317-18, 865 N.E.2d 845, 848-50 (2007).  The first tier
establishes a general grant of immunity by the language, "a
political subdivision is not liable in damages in a civil action
for injury . . . or loss to person . . . allegedly caused by any

56

act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." O.R.C. § 2744.02(A)(1) (emphasis added). The second tier then focuses on the five exceptions listed in O.R.C. § 2744.02(B). If any of the exceptions are applicable, then the third tier directs a court to determine whether any of the defenses contained in O.R.C. § 2744.03(A)(1)-(5) apply so as to "reinstate" immunity. Lambert v. Clancy, 125 Ohio St. 3d 231, 233, 927 N.E.2d 585, 588 (2010) (citing Elston, 113 Ohio St. 3d at 317, 865 N.E.2d at 849).

If that same employee of the political subdivision is sued also in his individual or personal capacity, O.R.C. § 2744.03(A)(6) governs the immunity analysis. Elston, 113 Ohio St. 3d at 321, 865 N.E.2d at 852. Such an employee is immune unless: "(a) [that] employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) [that] employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or] (c) [c]ivil liability is expressly imposed upon the employee by a section of the Revised Code." O.R.C. § 2744.03(A)(6)(a)-(c).

The Court concludes that the City of Cincinnati, and Officer O'Brien in his official capacity, is immune from suit. The events that occurred to Plaintiff JoAnn Snyder were born of

an employee of a political subdivision performing a "governmental" function, the provision of police services. O.R.C. § 2744.02(A)(1). No statutory exceptions to immunity would appear to apply in this case, see O.R.C. § 2744.02(B)(1)-(5), and Plaintiff identifies none. Even if an exception did apply, immunity would be reinstated. O'Brien's choice to seek a warrant for Plaintiff's arrest clearly was within his discretion to carry out the enforcement powers of his position as a police officer. See O.R.C. § 2744.03(A)(3) ("The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to . . . enforcement powers by virtue of the duties and responsibilities of the office or position of the employee.")

We conclude also that Officer O'Brien is immune from suit in his individual capacity as well. His choice to seek a warrant for Plaintiff's arrest clearly was within the scope of his official responsibilities. He reasonably relied upon the investigative details compiled by FBI Special Agent Giordano. We already have ruled that probable cause supported issuance of the warrant. That the FBI mistakenly identified Plaintiff JoAnn Snyder as the accomplice does not render O'Brien's actions to be malicious, indicative of bad faith, or wanton or reckless. Therefore, the motion to dismiss Plaintiff JoAnn's Snyder's

58

claim for negligent hiring, failure to train, negligent retention and supervision (Claim Four) against the City of Cincinnati alone and her claims for false arrest and imprisonment (Claim Five), assault (Claim Six), malicious prosecution (Claim Seven), abuse of process (Claim Eight), negligence (Claim Nine), negligent and/or intentional infliction of emotional distress (Claim Ten) and punitive damages (Claim Twelve) against it and Officer O'Brien (in his official and individual capacities) is GRANTED under Rule 12(b)(6). Similarly, the motion to dismiss Plaintiff Larry Snyder's claims for negligent and/or intentional infliction of emotional distress (Claim Ten), loss of consortium (Claim Eleven) and punitive damages (Claim Twelve) against Defendant the City of Cincinnati and Officer O'Brien (in his official and individual capacities) is GRANTED under Rule 12(b)(6).

## VI. **Conclusion**

In summary, the Court finds all three pending motions to dismiss to be well-taken. Thus, the Court hereby GRANTS Defendant the United States of America's Motion to Dismiss Claims of Plaintiff Jo Ann Snyder (doc. 11), Defendant Special Agent Chris Giordano's Motion to Dismiss (doc. 12), and Defendants the City of Cincinnati and Officer Jason O'Brien's Motion to Dismiss (doc. 16). Accordingly, the Court DISMISSES

59

Plaintiff JoAnn Snyder's claims against Defendant the United States of America (Claims Four through Six and Nine through Twelve), against Defendant Special Agent Chris Giordano (Claims One through Three and Twelve), against Defendant the City of Cincinnati (Claims One through Twelve), and against Defendant Officer Jason O'Brien (Claims One through Three and Five through Twelve), as well as Plaintiff Larry Snyder's claims against Defendants the City of Cincinnati and Officer Jason O'Brien (Claims Ten through Twelve).  As all pending motions have been decided and all claims against Defendants dismissed, the Court ORDERS this case CLOSED on its docket.

     SO ORDERED.


Dated:  January 7, 2014     s/S. Arthur Spiegel_____
                                 S. Arthur Spiegel
                                 United States Senior District Judge